## ST. JOHN et al. v. SCHULZE.

Patent Appeal No. 2596.

Court of Customs and Patent Appeals.
March 25, 1931.

Emery, Booth, Varney & Whittemore, of New York City (Lucius E. Varney, of New York City, Nichol M. Sandoe, of Boston, Mass., M. Whittemore, of New York City, and A. M. Holcombe, of Washington, D. C., of counsel), for appellants.

Steward & McKay, of Washington, D. C. (Roy F. Steward, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This is an appeal by St. John and Gray from concurring decisions of the Patent Office tribunals, awarding priority of invention to appellee Schulze.

The invention in issue is a process for producing useful mineral oil distillates, particularly lubricating oils, by distilling certain oil materials under very high vacuum, that is to say, at a very low absolute pressure and under nonoxidizing conditions. The three counts in issue follow:

"1. The process of producing useful mineral oil distillates which comprises distilling, under an absolute pressure not exceeding 25 millimeters mercury, mineral oil material containing substantially no constituents as volatile as gasoline.

"2. In the manufacture of lubricating oils, the process which comprises distilling a lubricant-containing mineral oil material at an absolute pressure not substantially exceeding 15 mm. of mercury and under non-oxidizing conditions.

"3. In the manufacture of lubricating oils, the process which comprises distilling a lubricant-containing mineral oil material at an absolute pressure not substantially exceeding 10 mm. of mercury and under non-oxidizing conditions."

The junior party Schulze filed his application on March 18, 1922, which matured into patent No. 1,448,709 on March 13, 1923.

The senior party, St. John and Gray, filed a joint application on April 21, 1919.

St. John and Gray took no testimony and are therefore restricted to their filing date (April 21, 1919).

In October, 1924, a year and a half after Schulze had obtained his patent and two years after the Schulze process had gone into commercial use on a large scale, St. John and Gray, whose application was still pending in the Patent Office, claimed the invention in the issues, and an interference was instituted which involved the three counts above quoted and which were taken from the Schulze patent.

There seems to be no controversy here, as far as the issue is presented to us, but that both parties, after St. John and Gray had filed an amended application copying numerous claims of the Schulze patent, claimed, in their applications, the same invention as described in the issues of the counts. While the issue that St. John and Gray could not make the counts had been contested before the Primary Examiner and the Law Examiner, as well as before the Board of Appeals, the Examiner of Interferences and the Board of Appeals found it unnecessary to go into this phase of the matter inasmuch as Schulze was found by the Board to be the prior inventor.

The evidence is voluminous. The record shows that Schulze is a petroleum technologist and had been connected with practical oil refining since 1910. Soon after the United States entered the World War, he resigned to go into military service as an enlisted man. A few months after enlisting in the Army, he was assigned to work at the Bureau of Standards under Winslow H. Herschel, who was in charge of the oil section of Automotive Power Division where his work consisted of analytical examination of mineral oils, together with research work for the lubricating division of the Aircraft Production Board of the United States Army.

In August, 1918, Herschel assigned him to the line of work which eventually led to the invention here at issue. One Van Klooster in the Bureau was at the time running some vacuum distillations in an effort to get some high-grade lubricating oil fractions for use by Bingham in standardizing a viscosimeter. On August 8, 1918, Van Klooster resigned his position at the Bureau. Herschel assigned Schulze to take up Van Klooster's work, since the oil fractions so far obtained were wholly unsatisfactory.

Schulze inspected the apparatus which Van Klooster had been using as well as the lubricating oil distillates which had been obtained. He found the oils to be cloudy and unstable and containing cracked products, and determined that it would not be possible by the methods then used to obtain the character of oil desired.

He was familiar with the so-called vacuum process of distillation of oils as was then practiced and employed in refining work, which process was carried on by never getting below 100 millimeters of mercury as a minimum and in laboratory distillations never getting below 40 to 50 millimeters. He believed that success could be obtained by distillations at a lower absolute pressure than had previously been employed and then had in mind employing an absolute pressure of 25 millimeters or less.

With the assistance of a glass blower in the Bureau of Standards, Schulze set up a small glass distilling apparatus, the joints of which were sealed with care in order to exclude the air. The apparatus was designed to operate with or without steam. It is described in the record as a "glass distilling flask of 1-liter capacity connected to a Liebig condenser, and two separatory funnels one above the other to provide a two-chamber receiver for condensate coming from the condenser." The same was set up and ready for operation by September 19, 1918, as is shown by the sketch of the apparatus in the record, known as Exhibit 1.

During the remainder of the year 1918, Schulze conducted numerous distillations with this apparatus at pressures below 25 millimeters absolute. Notes were kept showing the results under different pressures. Various types of materials were worked upon. Excellent lubricating oil distillates were obtained by this process as the result of numerous attempts.

All of his work during his 1918 service at the Bureau of Standards is corroborated fully by other competent witnesses, some of whom were employed in the Bureau of Standards and some of whom were not.

In December, 1918, Schulze was mustered out of the service, which severed his relation with the Bureau of Standards. During the first part of January, 1919, after passing the necessary civil service examination, Schulze again was connected with the Bureau of Standards where he worked under one Stratford. Stratford insisted upon his efforts being employed toward the production of oil by a distillation method at 40 to 50 millimeters and that he use a distilling apparatus which had been designed by Stratford and which was of metal. The result was not satisfactory. Stratford soon left the Bureau, and by May, 1919, Schulze, with the assistance of one Reynolds, succeeded in getting the apparatus in such shape that he could run distillations at from 14 to 20 millimeters,

and by June the apparatus had been revamped to a point where he could operate consistently at 5 to 6 millimeters absolute, with the result that the desired oil was produced.

On about April 1, 1920, in the Bureau of Standards, Exhibit 6 was constructed, and many tests were made on many different kinds of materials with the result that oil of high grade was produced at pressures varying from 5 to 6 millimeters absolute to as low as 1.5 to 2 millimeters absolute. This apparatus was made of metal and so tightened as to exclude the air and was of 2-quart capacity.

From the latter part of 1918 Schulze had endeavored to interest numerous persons in commercially producing lubricating oil by his method. It is conceded that those familiar with the art at that time in the commercial production of lubricating oil had no faith or confidence in producing the same by the Schulze method. The vacuum method was known to the art, but under pressures of from 100 to 200 millimeters absolute which did not give satisfactory results. The record contains long and detailed statements of his efforts to interest others in distilling oil on a large scale by his method. It is conceded that he (the appellee) was not financially able to install a plant which was large enough to produce oil on a large commercial basis and did not attempt to do so. The Bureau of Standards refused to permit the construction of a still of 50-barrel capacity, since it did not require that kind of still in order to illustrate the operation of his process or in order to obtain the oil which was needed for the purposes above stated.

In 1920, the Bureau of Standards sent Schulze as a representative or delegate to the Independent Oil Men's Association at Denver where he explained his process and produced samples of oil made thereby.

In February, 1921, he secured help in the installation of his process on a commercial scale, and, at Burnham, Ill., began supervising the erection of a unit of 50-barrel capacity. It was put into commercial operation September 30, 1921, and proved to be a complete success and cost about $30,000. The plant was soon enlarged. New units of large capacity were built there and elsewhere. A large number of refining companies of large production have taken licenses under the Schulze plan, and the production of lubricating oils by this process, in this country and other countries, has now grown to be very large.

The exact method used by Schulze in 1918 was later exclusively adopted by the Bureau for the distillation of oils.

The Examiner of Interferences held that the production of oil by the first two sets of apparatus .closely approached reduction to practice, but that, since it was clear that appellee did reduce to practice in 1920 and was diligent, he should be awarded priority, regardless of whether his 1918 work was or was not a reduction to practice.

The Board of Appeals held that appellee's work in 1918 was a reduction to practice and also held that, from the time of the 1918 operation until a commercial plant was built and the application for a patent filed, Schulze was diligent in every respect.

In this court it is urged by appellant that Schulze's work and accomplishments up to the installation of the commercial plant in 1920 did not amount to reduction to practice for the reason that it was not demonstrated that the process could be successful in producing oil on a commercial scale and that the record did not show a state of facts warranting the conclusion that Schulze was diligent from or immediately prior to the time appellant entered the field until his actual reduction to practice which the appellant concedes is the installation of the commercial plant.

We agree with the decision of the Board of Appeals in each of its findings, but, since we conclude that Schulze reduced to practice in 1918, it is not necessary to discuss in detail the subject of his diligence. We agree with the statement of the Board of Appeals as follows:

" * * * There appears to be no question. but that Schulze knew definitely what he was attempting to do and that when he did it there was no difficulty in reproducing the operation and in obtaining the desired oils. This is true both for the glass still and the iron still. Appellant contends that while he was successful with the small stills unexpected difficulties might have arisen with a larger commercial plant and that without such plant there was no actual reduction to practice. Some instances are cited of difficulties that might have arisen with the different conditions in the larger plant.

"We are convinced that the operations both with the one liter and the two liter stills were actual reductions to practice. The fact that difficulties might arise with the large commercial apparatus is not believed to be material. We are concerned with a method of producing oil and not with some particular apparatus for doing so. The method as car-

ried out at the Bureau was an absolute success for the purpose intended, that is, producing an oil for use in a viscosimeter and there is no question but that the oil produced was highly successful for lubricating purposes and the method carried out was an improvement over certain existing methods. Appellant has contended that Schulze was an analyst and that his work was merely analysis. The fact that he was employed as an analyst is not material as the production of oil in the manner described was purely a manufacturing operation." '

The counts of the interference call for a process of producing useful mineral oil by a certain process of distillation. Schulze successfully produced by his process the useful mineral oil which he sought to produce and he clearly taught the art of its production. It was not necessary for him in order to be entitled to priority of the counts involved to install a commercial plant and prove by such installation that his process would be a commercial success. The Examiner of Interferences, referring to one of the later operations by appellee on a later device, aptly said: "There was no apparent reason for supposing that equally satisfactory results could not be obtained on a larger scale and it can therefore be said that the success of the process had been adequately demonstrated." This suggestion, we think, applies with equal force to the work of appellee in 1918.

The contention of appellant here was substantially the contention of appellant in Harrison v. Cadwell, 39 F.(2d) 704, 709, 17 C. C. P. A. 1024, 5 Pat. Quarterly 91. There it was contended that the laboratory vulcanization of rubber and rubber articles was not .a reduction to practice of the process of vulcanization called for by the counts, since it was not demonstrated that it would be successful commercially. Following the decision of the Supreme Court of the United States in Corona Cord Tire Co. v. Doven Chemical Co., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610, this court said:

" * * * These tests were sufficient to prove conclusively the character of vulcanization attained. If laboratory tests and laboratory construction of inventions were to be rejected in cases of this kind, it would seem to us that it would lead to very grave consequences for future inventions. It may be that there are in the field of invention certain articles in which laboratory tests and laboratory manufacturing would hardly be regarded as a reduction to practice, but we do not think vulcanization of rubber can be placed in that class. * * *

"True enough, those who contemplate great expenditures in manufacturing establishments and equipment ofttimes apply many different tests in order to determine the commercial expediency of wholesale manufacture, but, because this is a practice among careful and responsible manufacturers, it does not follow that such a practice is the measure by which the patent tribunals should determine the question of reduction to practice in a case like that at bar."

See, also, Wietzel v. Lacy, 39 F.(2d) 672, 17 C. C. P. A. 943, 5 Pat. Quarterly 86.

Appellants argue with great earnestness that there are technical difficulties with Schulze's "experimental work" in 1918 which "failed to show would not be prohibitive in a commercial apparatus" and call attention to the fact that in high vacuum distillation of petroleum there is a phenomenon known in the art as "puking" or "spewing," which in the language of the layman has reference to a large mass of froth and foam which may form in the still and completely fill the vapor space and thus cause unvaporized oil to be carried over into the distillates.

Schulze's record of his 1918 apparatus, Exhibit 1, states: "Oil started foaming, heated the side and neck of flask to prevent 'puking.'" It is urged that overcoming this difficulty in this manner was not suggesting the means of overcoming it in a commercial apparatus. The appellee made no answer to this argument in his brief, and the Examiner of Interferences and the Board of Appeals do not mention it in their decisions.

In the addition to the record which is submitted on stipulation, the Examiner, in considering a claim in the St. John and Gray application, said: "Claims 6 to 9 are rejected for lack of invention; it is old to superheat the vapors in a distillation process to prevent spewing, as see," and here cites two references.

We do not think the "spewing" question is in any way determinative of the issues here. The method of controlling "spewing" was probably old in the art, but, if new, Schulze explained how he overcame the difficulty. He has asked no patent on his method or apparatus for overcoming it. His method calls for a process of producing oil which he described in detail and reduced to practice by producing oil in the manner called for by the claims.

■ We therefore conclude that, in order for Schulze to have reduced to practice his prior conception of the process of producing lubricating oil, it was not necessary to produce it on a commercial scale, and that, in his production of the same in 1918, he had demonstrated that his process would produce such oil when larger stills more suited to the needs of commerce were used. Certainly there was nothing connected with his operations in 1918 to leave him or any one as familiar as himself with the subject-matter in doubt as to the possibility of producing the same under commercial conditions.

The decision of the Board of Appeals is affirmed.

Costs of additional record to be taxed against appellant.

Affirmed.